UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

**NIGHT BOX FILED**

Case No:

**04-81195**

DEC 29 2004

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

MOBILE MEDICAL INDUSTRIES, INC.,
a corporation,

      Plaintiff,

**CIV-PAINE**

v.

**MAGISTRATE JUDGE JOHNSON**

ELITE HOME HEALTH OF THE PALM
BEACHES, L.L.C., a limited liability company,

and

ELITE MD, INC., a corporation

and

JAMES PADULA, D.O., an individual,

      Defendants.

_____/

## VERIFIED COMPLAINT

COMES NOW Plaintiff Mobile Medical Industries, Inc. ("MMI" or "Mobile Medical")
by and through the undersigned counsel, and hereby files this Verified Complaint against
defendants Elite Home Health Of The Palm Beaches, L.L.C., Elite MD, Inc. and James Padula
("Padula"), hereinafter sometimes referred to collectively as "Defendants. " For its complaint
against the Defendants, Mobile Medical alleges the following:

## NATURE OF THE CASE

1.     This is an action for injunctive relief and damages arising from: (a) infringement
of registered copyrights in violation of the Copyright Act, as amended (the "Act"), 17 U.S. C.

§101, et seq., (b)  breach of Padula's nonsolicitation and noncompetition covenants; (c) breach of Padula's fiduciary duties / duties of loyalty to MMI; (d) tortious interference with MMI's business relationships, contracts, and expectancies; (e) Padula's unlawful trespass on MMI's properties, and (f) misappropriating Mobile Medical's trade secrets.  MMI seeks to protect its legitimate business interests by preventing the disclosure and unauthorized use of its valuable confidential business information.

## PARTIES, JURISDICTION AND VENUE

2.      Mobile Medical is a corporation, duly organized and existing under law, and is the successor in interest to Mobile Medical Industries, L.L.C, a limited liability company. Mobile Medical is authorized to and does conduct business in the State of Florida and has its principal place of business in Palm Beach County, Florida.  Mobile Medical also does business as CareAdvantage, CareServices, MD to You and CareTherapy.

3.      Upon information and belief, MMI is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery that Elite Healthcare of The Palm Beaches, L.L.C. is a limited liability company and Elite MD, Inc. is a corporation, and one or both of such entities engaged in the conduct alleged herein (Elite Healthcare of The Palm Beaches, L.L.C., and Elite MD, Inc. are herein sometimes collectively referred to as "Elite" or "Elite Healthcare").

4.      Elite, upon information and belief, conducts business in the State of Florida, including in Palm Beach County, and is a direct competitor of Mobile Medical in certain parts of the State of Florida where Mobile Medical conducts and/or solicits business.

5.      Padula is a citizen of the United States and, upon information and belief, a resident and domiciliary of Broward County, Florida within this District.

6.      The Court has subject matter jurisdiction over this action pursuant to 28 U. S. C. §§ 1331 (federal question) and 1338(a) (copyrights).  Pursuant to 28 U.S.C. §§ 1338(b) and 1367(a), the Court has pendent jurisdiction over the other claims alleged herein in that the facts and allegations upon which such claims are premised arise out of the same common nucleus of operative facts.

7.      Pursuant to 28 U.S.C. §§1391(b) and (c), and §1400(a), venue properly rests in this District, as Defendants reside and/or may be found in this District, Defendants are subject to personal jurisdiction in this District, and one or more of the wrongful acts of Defendants which are the subject of this action have taken place or are threatened to take place in this District..

8.      All conditions precedent to the maintenance of this action have been satisfied, performed or waived.

## FACTS

9.      MMI is engaged in the highly competitive home healthcare and physician house call industry.  MMI's business is involved, among other things, in providing physician house calls, mobile diagnostics and a range of nursing, rehabilitation and home health services.  MMI conducts operations throughout the state of Florida, including in Palm Beach County, Florida, where its headquarters are located.

10.     MMI is the owner of the Risk Management Policies and Procedures Manual and forms contained therein (referred to hereafter as the "Registered Work").  The Registered Work contains material wholly original to MMI that is copyrightable subject matter under the laws of the United States.  On or about December 12, 2004, MMI applied to register its copyrights in the Registered Work in the United States Copyright Office.  Thereafter, the Copyright Office duly issued a registration certificate, a copy of which is attached to this Complaint, marked Exhibit 1,

and incorporated herein by reference.  The registration certificate entitles MMI to a presumption

of validity under 17 U.S.C. § 410(c).   MMI is the proprietor of all right, title, and interest in and

to the copyrights in the Registered Work, including the right to sue for infringement.

11.     The home healthcare business is highly competitive.  A number of businesses

compete with MMI in the home healthcare market in Florida, including Elite Healthcare.

12.     MMI's success in this highly competitive industry is dependent, among other

things, upon its relationships and contacts with referral sources, and upon confidential and

proprietary information that MMI has developed over the years through the expenditure of

substantial time and resources.  Such confidential and proprietary information consists of, but is

not limited to, identities of and information concerning customers and patients of Mobile

Medical; identity of and information concerning referral sources (including but not limited to

contact information, types and levels of business referred, and preferences and levels of

business); identity of and information concerning personnel (including but not limited to

compensation, skills and business production and responsibility); information concerning the

preferences, complaints, and requirements of independent and assisted living facilities where

Mobile Medical does business, and the preferences, complaints and requirements of referral

sources and customers; marketing methods and strategies; pricing; financial information

concerning specific offices and their respective business production, volume and costs; budgets,

business plans, customer lists, patient lists; patient information and other proprietary and

confidential information concerning the business of MMI (the "Confidential Information").

13.     The Confidential Information derives independent economic value, actual or

potential, from not being generally known to, and not being readily ascertainable by proper

means by other persons who can obtain economic value from its disclosure and use.  Further, the

- 4 -

Confidential Information is the subject of efforts by MMI that are reasonable under the circumstances to maintain its secrecy, including but not limited to restricting access to such information and requiring employees to sign specific confidentiality and non disclosure agreements.

14.     As a result of its investment of significant resources, MMI has developed substantial goodwill in the home healthcare industry in the State of Florida.

15.     The Classic at West Palm Beach (hereinafter referred to as "The Classic") is a retirement community, located in Palm Beach County, Florida, that provides independent and assistive living housing and meals for senior residents.

16.     Mobile Medical or its predecessor in interest has been doing business with The Classic for approximately four (4) years. During that time, Mobile Medical or its predecessor in interest has leased space at The Classic, and contracted with The Classic to provide therapy and home health /private duty health care services to residents at the retirement community, and in fact has provided therapy and home health services to residents there.  Mobile Medical derives significant revenue from the services provided to residents.

17.     MMI has written agreements with The Classic to coordinate healthcare for residents, and licenses and leases space at The Classic for the purpose of providing rehabilitative services and private duty care (such as private nursing care, private home health aides and sitters).  Mobile Medical had a reasonable expectation that this business relationship would continue.

18.     MMI also has similar arrangements at other retirement communities in the State of Florida, including, among others, Fountainview, The Atrium and Lake Worth Gardens in Palm Beach County, and Park Summit in Broward County.

19.     MMI has a written agreement with Fountainview to lease space at the facility to provide physician care health care services and to provide other health care services. Mobile Medical has been doing business with Fountainview since at least 2001 and had a reasonable expectation that this business relationship would continue.

20.     Mobile Medical has an agreement with Lake Worth Gardens and with Park Summit to lease space there to provide certain health care services, and also provides physician care services at each of these retirement communities. Mobile Medical has been doing business at each of these retirement communities for several years and had a reasonable expectation that these business relationships would continue.

21.     Until she voluntarily resigned on November 5, 2004, Michelle Carter ("Carter") was employed by Mobile Medical in the position of RN / Site Manager or Care Team Manager ("Care Team Manager") for Mobile Medical at The Classic. In that capacity, she was entrusted with the management and day to day operation of the facility and was the principal contact with the customer. She worked independently on site with only limited day to day supervision.

22.     Until he voluntarily resigned on the close of business Friday, November 12, 2004, Padula was working for Mobile Medical providing physician house call services to residents at multiple client facilities of Mobile Medical, including Fountainview, Lake Worth Gardens, The Atrium, and Park Summit.  As in the case of its contractual relationship with The Classic, Mobile Medical has been providing such services at those retirement communities for some time and had a reasonable expectation that those relationships would continue.

23.     During her employment with MMI, Carter had access to and learned of Confidential Information of MMI, including information concerning pricing and other contract terms with The Classic, the customer's requirements, preferences, concerns and needs, levels and

volumes of business and types of business, key and important personnel employed by MMI at the facility and their compensation, customer information, patient names and information, and confidential employee information.

24.     During his employment with MMI, Padula had access to and learned of Confidential Information of MMI, including information concerning patients and employees, levels and volumes of business and types of business, key and important personnel employed by MMI at its facilities, customer information, and patient names and information.  He also had access to and used the Registered Work.

25.     At all times during their employment with MMI, Carter and Padula each owed Mobile Medical a duty of loyalty to exercise diligence and good faith in matters relating to their employment. Carter's position as Care Team Manager placed her in a particularly high level of trust and confidence.

26.     In connection with her employment with MMI, and for valuable consideration received, Carter entered into a "Non-disclosure, Confidentiality Agreement" (hereinafter referred to as "the Carter Agreement"). A true and correct copy of the Agreement is attached, marked Exhibit 2 and incorporated herein by reference.

27.     The Carter Agreement provides, in part:

Michelle Carter acknowledges that Company property includes not only tangible property, like desks, typewriters and computers, but also intangible property such as information.  Of particular importance is proprietary and confidential information …

The undersigned … hereby agrees:
    1.      Not to use or disclose any proprietary or confidential information that he/she obtains while performing work for the Company, except as required for business reasons.  This obligation remains even after the employment relationship or independent contractor relationship with the Company ends.

2.      Not to divulge any trade secret, client list, price list, supplier list or any other useful information gained or taken from any Company.

3.      Not to divulge any personal, financial or corporate information on Company's clients or employees or patients.

4.      Not to divulge any personal, financial or medical information on Company's patients …

(Carter Agreement ¶ 1-2).

28.     The Carter Agreement also provides that it will be construed in accordance with the laws of the State of Florida. (Carter Agreement ¶ 4). And, the Carter Agreement provides that if the Company is forced to retain counsel to enforce the restrictions contained in this Agreement, Carter shall be responsible for all costs and attorney's fees incurred by MMI in enforcing that agreement. (Carter Agreement ¶ 4).

29.     In connection with his employment with MMI, and for valuable consideration received, Padula entered into an "Employment Agreement" dated October 9, 2000 (hereinafter referred to as "the Padula Agreement"). A true and correct copy of the Padula Agreement is attached, marked Exhibit 3 and incorporated herein by reference.

30.     The Padula Agreement provides in part:

8.2 **Disclosure of Information.** Employee recognizes and acknowledges that all records, files, reports, protocols, policies, manuals, databases, processes, procedures, computer systems, materials and other documents pertaining to services rendered by Employee hereunder, or to the operations of Employer, belong to and shall remain the property of Employer and constitute proprietary information and trade secrets of Employer. Employee recognizes and acknowledges that the terms of this Agreement, as well as Employer's proprietary information and trade secrets as they may exist from time to time, are valuable, special, and unique assets of Employer's business. Employee shall not, during or after the Term, disclose such proprietary information of Employer or trade secrets of Employer to any other firm, person, corporation, association or other entity for any reason for purpose whatsoever, or use such information for his association or other entity for any reason or purpose whatsoever, or use such information for his own benefit, without the prior consent of the Employer. …

10.1 **Covenants Not to Compete.** … Employee hereby agrees that, during the Term and for a period of two years thereafter … Employee shall not (i) engage in

the practice of medicine for a business or company which provides, distributes markets, promotes, or advertises mobile physician medical services within a radius of 50 miles from any office of Employer; (ii) accept employment with, or otherwise provide services for or own any interest in, a business or company which provides, distributes, markets, promotes, or advertises mobile physician medical services within a radius of 50 miles from any office of Employer; or (iii) perform services directly or indirectly for any facility for which Employer provided services during the Term. …

10.2 **Covenant Not to Solicit.**  Employee further agrees that, upon expiration or termination of this Agreement for any reason, Employee shall not contact, solicit or attempt to contact or solicit any patient previously treated by Employer, or any facility for which Employer provided services during the Term, including, without limitation, by means of any direct mailings or announcements, and Employee shall not employ or otherwise engage any person who was employed or engaged by Employer at any time during the six months prior to the date of termination or expiration.

(Padula Agreement, Exhibit 3)

31.     The Padula Agreement provides that it will be construed according to the laws of

the State of Florida and that if any litigation arises as a result of the terms of the Padula

Agreement, the prevailing party shall be entitled to recover attorneys' fees.  (Exhibit 3 §§ 11.4,

11.5).

32.     The Employment Agreement has continued in full force and effect beyond its

original term by reason of the actions of the parties thereafter, including Padula's continued

employment.

33.     During the term of her employment with Mobile Medical and while employed as

the Care Team Manager at The Classic, Carter clandestinely directly solicited employees of

MMI to terminate their employment with Mobile Medical and apply for and work for Elite at

The Classic, in direct contravention to her duty of loyalty as an employee of MMI.  As part of

this conduct, she provided employees applications and information concerning Elite and targeted

key personnel employed by Mobile Medical at the facility.  Some, but not all, employees of MMI at the site have been recruited.

34.     During the term of her employment with Mobile Medical and while employed as the Care Team Manager for The Classic, Carter, upon information and belief, clandestinely solicited, discussed and worked with The Classic to terminate The Classic's contractual arrangements with MMI and substitute Elite for Mobile Medical at the site, and to do so without giving any required contractual notices, and has assisted in diverting patient care services and business away from Mobile Medical for the benefit of another, such that the services continued to be provided by MMI personnel but MMI was not listed as the billing party for such services.

35.     Upon information and belief, Carter arranged for an orientation of Mobile Medical employees at The Classic to induce and solicit Mobile Medical employees to resign their employment and accept work for Elite.

36.     Mobile Medical visited The Classic on Friday November 5, 2004 to meet with management at The Classic and to meet with Carter after receiving reports from employees that Carter had been providing employees with applications to work for Elite and that Elite would be taking over the contract at The Classic. When representatives of Mobile Medical made contact with Carter, she handed them a written letter of resignation.

37.     Representatives of Mobile Medical then met with the Executive Director at The Classic. She informed MMI that everything was fine and lead them to believe there was no problem at the facility in so far as Mobile Medical was concerned.

38.     On or about  November 10, 2004, the same individual called MMI to advise she was sending a letter terminating The Classic's contract with MMI. That same day, The Classic sent a letter to terminating its contract with MMI on thirty (30) days notice, without giving the

required sixty (60) day notice called for in a lease agreement between The Classic and Mobile Medical.

39.     Upon information and belief, Carter, while employed by MMI and for the benefit of Elite, made efforts to undermine Mobile Medical's reputation with The Classic and the quality and level of service provided at The Classic in an effort to facilitate the termination of The Classic's contractual relationship and expectancies with Mobile Medical. When representatives of Mobile Medical met with the Executive Director at The Classic she made specific comments about how Carter had been treated by Mobile Medical.

40.     On Friday, November 5, 2004, Mobile Medical also received a report that Padula was behind the activities of Carter.

41.     A representative of Mobile Medical met with Padula on Monday morning, November 8, 2004, to investigate the report and gain a better insight into Padula's situation. This was after the Complaint in this action was filed with the Court.

42.     Padula admitted he had been contacted by competitors about employment, including Elite, but denied that he had been soliciting any retirement community to cease doing business with MMI or to continue to do business with him if he left MMI. He indicated that he would never solicit employees or accounts of MMI while he was working for Mobile Medical.

43.     During this discussion, MMI and Padula also agreed to revisit the terms of his compensation arrangement. Padula lead MMI to believe that he was interested in continuing with Mobile Medical.

44.     On Thursday, November 11, 2004, MMI met with Padula to discuss a proposed new agreement including new compensation terms.  Padula thanked MMI for the draft, identified some areas of disagreement, and indicated he would have his attorney review the document and

get back to MMI with comments. Unbeknownst to MMI management at the time, one or two days before Madge Oates, an MMI employee, and Padula had met with a management employee at Fountainview to advise that Padula was leaving MMI and to attempt to convince Fountainview to continue working with Padula on behalf of Elite.

45.     During the week of November 8, 2004, after Carter had resigned, Carter and Padula were observed together at The Classic.

46.     Late in the afternoon of Friday, November 12, 2004, Padula faxed a written resignation letter to Mobile Medical. In that letter, he resigned effective immediately upon presentation to MMI. He advised in the letter that he would be available to supervise nurse practitioners, cover patient calls, and sign any required paperwork for these tasks for the next 30 days if MMI will pay for those services. He then indicated that if MMI needed to contact him, they should contact him through his attorney, and provided the attorneys name, address and fax number.

47.     When Mobile Medical visited Fountainview and Lake Worth Gardens on Monday to advise them of the resignation, it was apparent that the accounts and MMI staff at the facilities already were aware of the resignation. Fountainview officials advised they were already considering whether to retain Mobile Medical or go with Padula because they believed their residents did not like change.

48.     Upon information and belief, during the term of his employment with Mobile Medical, Padula clandestinely solicited, attempted to persuade, and discussed with retirement communities where he worked for MMI to terminate their contractual relationship with Mobile Medical and use him to continue to provide services at the retirement community on behalf of Elite.

49.     Upon information and belief, during the term of his employment with Mobile Medical, and as part of an effort to undermine, disrupt and/or appropriate the business of MMI at retirement communities where it had contractual and business relationships, Padula clandestinely directly solicited employees of MMI to terminate their employment with Mobile Medical and apply for and work for Elite at facilities under contract with MMI, in direct contravention to his duty of loyalty as an employee of MMI. As part of this conduct, Mobile Medical is informed and believes that Padula targeted key personnel employed by Mobile Medical at facilities where he provided services for and on behalf of Mobile Medical.

50.     Padula, after his resignation from MMI, has provided patient care services to residents at Fountainview and Lake Worth Gardens.

51.     On Tuesday, November 16, 2004, Padula was found in Mobile Medical's leased space at Fountainview with a resident who was believed to be a patient of MMI. Padula was using Mobile Medical's leased space without authorization or permission.

52.     The following day, November 17, 2004, Mobile Medical discovered that Madge Oates, an employee of Mobile Medical at Fountainview who had previously given two weeks notice of her resignation had been requested by Elite to fax Elite names of patients at the retirement community who needed to be seen by Padula, and that Madge Oates had attempted or was about to attempt to fax to Elite names and/or information concerning residents at Fountainview who were being treated by Padula during his employment with Mobile Medical.

53.     The same day, Mobile Medical discovered that Elite had sent a fax to a Mobile Medical employee at Lake Worth Gardens named Evelyn, also asking her to fax Elite names and/or information concerning patients scheduled to be treated by Padula that week under his prior schedule with MMI.

54.     Shortly after Carter resigned, a Mobile Medical employee working at The Classic also resigned. Shortly after Padula resigned, an employee at Fountainview, described above, gave her notice of resignation. Padula's driver /assistant also resigned.

55.     Upon information and belief, MMI is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery that since his resignation, Padula has been following the same schedule he had following during his MMI employment at the time he left and been visiting the retirement communities he had been visiting on behalf of MMI and seeing residents there, according to the same schedule he visited during his MMI employment as if he were still working for MMI and was on the same schedule.

56.     Mobile Medical's ability to serve residents at The Classic, Fountainview, The Atrium, Lake Worth Gardens and other facilities with similar arrangements, without immediate interruption would be undermined by an orchestrated departure of its key employees at the sites.

57.     Upon information and belief, MMI is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery,  that since Carter left Mobile Medical's employment, and in an effort to gain patients for Elite to be treated by Padula, Carter has advised one or more residents at the Classic that the physician who was providing services at the Classic as an employee of Mobile Medical was resigning his employment when if fact that was not true.

58.     Upon information and belief, MMI is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery that Padula has advised one or more residents he had treated as an employee of Mobile Medical that he had been dismissed by Mobile Medical when in fact that was not the case.

59.     Upon information and belief, MMI is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery that Padula has been using confidential Mobile Medical information and medical records secured through his employment with Mobile Medical to secure consents to treat and transfer records to his new business/employer, and has been copying and/or using portions of the Registered Work to conduct his business activities on behalf of Elite. In particular upon information and belief, MMI is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery that Padula has been using one of the forms contained in the Registered Work to use in connection with his treatment of patients he previously treated while working for MMI. This was done without the knowledge or consent of MMI and was not authorized by MMI.

60.     Mobile Medical has ongoing patient relationships with various residents at The Classic, Fountainview, The Atrium, Lake Worth Gardens, Park Summit and other facilities where Padula provided services on behalf of Mobile Medical. Termination of its contractual relationships and expectancies with these facilities could undermine those relationships.

61.     Upon information and belief, Carter and Padula have used, and disclosed or plan to disclose, Confidential Information of Mobile Medical to Elite for the benefit of Elite and in contravention of the interests of MMI.

62.     By virtue of their respective positions and employment with Elite, it is inevitable that Carter and Padula will use Confidential Information for, or divulge or furnish Confidential Information to Elite.

63.     As a result of Carter's and Padula's unlawful acts, MMI has had to retain the undersigned counsel and is obligated to pay them a reasonable attorneys' fee for their services.

64.     Upon information and belief, MMI is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery that the actions of Padula in copying and/or using the Registered Work as alleged herein was willful. There is a real and immediate threat that Elite, through the actions of its agents, will, directly or indirectly through others, continue to solicit The Classic and other MMI accounts, and MMI's employees, copy and/or use without authorization the Registered Work in whole or in part, and/or use or disclose the Confidential Information of MMI, which Carter acquired while employed by MMI, for the use and benefit of Carter and Elite and to the detriment of MMI.

65.     Carter had a duty of loyalty to Mobile Medical and during her Mobile Medical employment should not have engaged in the conduct described above and should have disclosed to MMI what was occurring at the facility where she managed MMI's services. Carter, as Care Team Manager for MMI at The Classic knew, or should have known, of MMI's interests in its relationship with The Classic.

66.     Carter's conduct, as described above, was intentional and unjustified and interfered with MMI's relationship with The Classic and violated her duties of loyalty to MMI.

67.     The acts of each of Carter and Padula, as alleged herein, were upon information and belief as an agent of, and/or for the benefit and on behalf of, Elite and were for the financial gain of Elite and/or (in the case of Padula), for Padula's financial gain.

68.     There is a real and immediate threat that Padula will continue to solicit Fountainview and other facilities where he treated residents while employed by Mobile Medical, and patients he treated on behalf of Mobile Medical, copy and use the Registered Work and/or use or disclose Confidential Information of MMI, which Padula acquired while employed by MMI, for the use and benefit of himself and Elite and to the detriment of MMI.

- 16 -

## COUNT I

## COPYRIGHT INFRINGEMENT UNDER THE COPYRIGHT ACT

69.     The allegations set forth in Paragraphs 1 through 68 above are realleged and incorporated herein by reference.

70.     Defendants' actions relating to the Registered Work alleged herein constitute copyright infringement arising under the Copyright Act.

71.     Defendants' actions as alleged herein constituted a direct infringement of MMI's right to reproduce, create derivative works and distribute the Registered Work.

72.     MMI has been damaged by the actions of Defendants in an amount which cannot be determined with certainty at this time.

WHEREFORE, MMI prays that this Court enter judgment in favor of MMI in its favor on Count I of this Complaint and award MMI relief, including but not limited to the following (a) Defendants and all persons acting in concert or participation with either of them be temporarily, preliminarily and permanently enjoined and restrained pursuant to 17 U.S.C. §502 from infringing MMI's copyright, (b) an order requiring Defendants to deliver to MMI all copies of materials that infringe MMI's copyright pursuant to 17 U.S.C. § 503, (c) an order requiring Defendants to provide an accounting of any and all sales related to the use of the Registered Work, (d) award MMI monetary relief for all damages sustained by post-registration use/infringement of the Registered Work according to proof at trial, (e) awarding MMI its costs and attorneys fees in this action, (f) awarding MMI actual or statutory damages for infringement and willful infringement pursuant to 17 U.S.C. §504 as appropriate, and (g) award MMI such other and further relief as the Court deems just and proper.

## COUNT II
## BREACH OF EMPLOYEE DUTY OF LOYALTY—INJUNCTIVE RELIEF
## (PADULA)

73.     The allegations set forth in Paragraphs 1 through 68 above are realleged and incorporated herein by reference.

74.     Padula had a duty of loyalty to Mobile Medical during his employment with Mobile Medical and during his MMI employment should not have engaged in the conduct described above.

75.      By reason of the above, Padula has violated his duty of loyalty, diligence, good faith and fair dealing as an employee of MMI.

76.     Padula, as a medical provider of services employed by MMI knew, or should have known of MMI's interests in its relationship with the retirement communities where he provided services and its relationship to the residents of those communities who he treated.

77.     Padula's conduct, as described above, was intentional and unjustified and interfered with MMI's relationship with Fountainview and certain other retirement communities with which Mobile Medical enjoyed contractual relationships or expectancies.

78.     Unless Padula and all others through or with whom they are acting are enjoined by this Court from engaging in the wrongful conduct described herein, MMI will suffer irreparable injury and harm for which it lacks an adequate remedy of law, including but not limited to the unjustified loss of a valuable business relationship and expectancy with The Classic, Fountainview, Lake Worth Gardens and additional retirement communities where Padula provided services for Mobile Medical.

79.     MMI has been and is likely to continue to be substantially and irreparably injured in its business, and the threat of continued injury to its business, customer relations, employee

relations and referral source relations, and the attendant goodwill outweighs any harm the issuance of an injunction may cause Padula.

80.     MMI has a substantial likelihood of success on the merits of its claims against Padula.

81.     The issuance of an injunction as requested herein by MMI will in all respects serve the public good, as the companies who are risk takers in the commercial world, having developed advantageous business and employment relationships, having accumulated trade secrets and confidential and proprietary information, having entrusted employees with responsibilities and customer contacts for which they expect a duty of loyalty, and having developed substantial customer bases and goodwill through the expenditure of substantial resources, should be protected, and employees should not be allowed to profit from breaches of their duties of loyalty.

**WHEREFORE**, MMI prays that this Court:

(a)     temporarily, preliminarily and permanently enjoin Padula from

(1)  directly or indirectly interfering with MMI's relationships with Fountainview, Lake Worth gardens and all other facilities where Padula provided service on behalf of MMI, including The Classic, Casa Del Mar, Fountainview, Lake Worth Gardens, Newport Place / Pointe, Park Summit, and Sunrise Atrium.

(2) directly or indirectly soliciting MMI's employees to work on behalf o any company other than MMI;

(3)  using or disclosing any confidential, proprietary or trade secret information of MMI, including any trade secret, client list, price list or supplier list;

- 19 -

(4) engaging in the practice of medicine for a business or company which provides, distributes, markets, promotes, or advertises mobile physician medical services within a radius of 50 miles from any office of MMI;

(5) accepting employment with or otherwise providing services to any business or company which provides, distributes, markets, promotes, or advertises mobile physician medical services within a radius of 50 miles from any office of MMI;

(6) performing services directly or indirectly for any facility for which MMI provided services during Padula's employment with MMI, including The Classic, Casa Del Mar, Fountainview, Lake Worth Gardens, Newport Place / Pointe, Park Summit, and Sunrise Atrium;

(7) contacting, soliciting or attempting to contact or solicit any patient previously treated by MMI, or any facility for which MMI provided services during Padula's employment with MMI, including without limitation, by means of any direct mailings or announcements;

(8)  employing or otherwise engaging any person who was employed or engaged by MMI at any time during the six months prior to Padula's resignation; and

(b)     award MMI the costs of this action, and

(c)     award MMI such other and further relief as this Court deems just and proper.

## COUNT III

### BREACH OF EMPLOYEE DUTY OF LOYALTY—DAMAGES
### (PADULA)

82.     The allegations set forth in Paragraphs 1 through 68 and 74-77 above are realleged and incorporated herein by reference.

83.     By reason of the above, Padula violated his duty of loyalty, diligence, good faith and fair dealing as an employee of MMI.

- 20 -

84.     MMI has suffered damages as a result of said disloyalty in an amount which cannot be determined with certainty at this time but is believed to be in excess of $15,000.00.

**WHEREFORE,** MMI requests that this Court enter Judgment for MMI and against Padula:

(a)     awarding MMI damages, including actual damage, according to proof at trial for all damages caused by Padula's actions;

(b)     awarding MMI the fees and costs of this action; and

(c)     awarding MMI such other and further relief as this Court deems just.

## COUNT IV
## BREACH OF CONTRACT—INJUNCTIVE RELIEF
## (PADULA)

85.     The allegations set forth in Paragraphs 1 through 68 above are realleged and incorporated herein by reference.

86.     MMI's Agreement with Padula is supported by legitimate business interests, including one or more of the following:  (a) the confidential and proprietary business information, including the identities of MMI's customers and referral sources; (b) MMI's substantial relationships with specific current and prospective customers, patients and referral sources; and (c) MMI's goodwill with customers, patients, referral sources and employees, generated through its time, efforts and resources.

87.     By reason of the above, Padula has violated the terms of the Employment Agreement. There is a real and immediate threat that Padula will, directly or indirectly through others, continue to solicit MMI's referral sources and retirement communities where he worked for MMI, solicit MMI employees, solicit MMI's customers, and use or disclose the Confidential

- 21 -

Information of MMI which he acquired while employed by MMI, for the use and benefit of himself and others, all to the detriment of MMI.

88.     Unless Padula and all others through or with whom he is acting are enjoined by this Court from engaging in the wrongful conduct described herein, MMI will suffer irreparable injury and harm for which it lacks an adequate remedy of law.

89.     MMI has been and is likely to continue to be substantially and irreparably injured in its business, and the threat of continued injury to its business, customer relations, employee relations and referral source relations, and the attendant goodwill outweighs any harm the issuance of an injunction may cause Padula.

90.     MMI has a substantial likelihood of success on the merits of its claims against Padula.

91.     The Agreement is reasonably necessary for the protection of the business and goodwill of MMI, and MMI would sustain great and irreparable loss and damage if Padula should continue to violate the covenants set forth therein, through himself or others.

92.     The issuance of an injunction as requested herein by MMI will in all respects serve the public good, as the companies who are risk takers in the commercial world, having developed advantageous business and employment relationships, having accumulated trade secrets and confidential and proprietary information, having entrusted employees with confidential information, and having developed substantial customer bases and goodwill through the expenditure of substantial resources, should be protected.

**WHEREFORE**, MMI prays that this Court:

(a)     temporarily, preliminarily and permanently enjoin Padula, and all persons acting by through or in concert with him, from further violations of his Agreement including:

(1)  directly or indirectly interfering with MMI's relationships with The Classic, Casa Del Mar, Fountainview, Lake Worth Gardens, Newport Place / Pointe, Park Summit, and Sunrise Atrium;

(2) directly or indirectly soliciting MMI's employees to work on behalf of any company other than MMI;

(3) using or disclosing any confidential, proprietary or trade secret information of MMI, including any trade secret, client list, price list or supplier list;

(4) engaging in the practice of medicine for a business or company which provides, distributes, markets, promotes, or advertises mobile physician medical services within a radius of 50 miles from any office of MMI;

(5) accepting employment with or otherwise providing services to any business or company which provides, distributes, markets, promotes, or advertises mobile physician medical services within a radius of 50 miles from any office of MMI;

(6) performing services directly or indirectly for any facility for which MMI provided services during Padula's employment with MMI;

(7) contacting, soliciting or attempting to contact or solicit any patient previously treated by MMI, or any facility for which MMI provided services during Padula's employment with MMI, including without limitation, by means of any direct mailings or announcements;

(8)  employing or otherwise engaging any person who was employed or engaged by MMI at any time during the six months prior to Padula's resignation; and

(b)      award MMI the costs of this action, and

(c)      award Mobile Medical such other and further relief as this Court deems just and proper.

## COUNT V
### INJUNCTIVE RELIEF UNDER
### FLORIDA UNIFORM TRADE SECRETS ACT (ALL DEFENDANTS)

93.     This is an action for injunctive relief pursuant to the Florida Uniform Trade Secrets Act, Chapter 688, Florida Statutes (hereinafter "Chapter 688").

94.     MMI realleges and incorporates Paragraphs 1 through 68 as if fully set forth herein.

95.     The Confidential Information of MMI constitutes trade secrets pursuant to Chapter 688.

96.     The Defendants acquired such Confidential Information under circumstances giving rise to a duty to maintain its secrecy and limit its use.

97.     By reason of the above, Defendants have misappropriated or threatened to misappropriate MMI's Confidential Information.  MMI is entitled to injunctive relief for the actual and threatened continued misappropriation of its Confidential Information pursuant to Florida Statute §688.003.

98.     MMI is entitled to attorneys' fees pursuant to Florida Statute §688.005.

**WHEREFORE**, MMI prays that this Court:

(a) temporarily, preliminarily and permanently enjoin Defendants, and all persons acting by, through or in concert with them, from using, disclosing or threatening to use or disclose any Confidential Information of MMI;

(b) award MMI its reasonable fees and costs; and

(c) award MMI such other and further relief as this Court deems just.

## COUNT VI
### DAMAGES UNDER FLORIDA
### UNIFORM TRADE SECRETS ACT (ALL DEFENDANTS)

- 24 -

99.     This is an action against Defendants for damages pursuant to the Florida Uniform Trade Secrets Act, Chapter 688, Florida Statutes (hereinafter "Chapter 688").

100.    MMI realleges and incorporates paragraphs 1 through 68 as if fully set forth herein.

101.    Confidential Information of MMI constitutes trade secrets pursuant to Chapter 688.

102.    By reason of the above, Defendants have misappropriated the trade secrets of MMI within the meaning of Chapter 688.

103.    MMI has suffered damages as a result of said misappropriation in an amount which cannot be determined with certainty at this time but is believed to be in excess of $15,000.00, and is entitled to exemplary damages of up to twice the amount of damages awarded, pursuant to §688.04, Fla. Stats. if it is determined that Defendants acted willfully and maliciously.

104.    MMI is entitled to attorney's fees pursuant to §688.005, Fla. Stats.

**WHEREFORE,** MMI requests that this Court enter Judgment for MMI and against Defendants:

(a)     awarding MMI damages, including actual damage, according to proof at trial, for all damage caused by Defendants' misappropriation of trade secrets and exemplary damages of up to twice the damages awarded;

(b)     awarding MMI the fees and costs of this action; and

(c)     awarding MMI such other and further relief as this Court deems just.

## COUNT VII
## DAMAGES FOR BREACH OF CONTRACT
## (PADULA)

105.　This is an action against Padula for damages in excess of $15,000, exclusive of interest, costs and attorneys' fees, for breach of his agreement.

106.　MMI realleges and reincorporates paragraphs 1 through 68 as if fully set forth herein.

107.　By reason of the above, Padula has breached his Employment Agreement with MMI by soliciting MMI's employees to work for a company other than MMI, soliciting MMI's customers on behalf of a company other than MMI, competing within 50 miles of MMI's business, using or disclosing, or threatening to use or disclose, MMI's Confidential Information for the benefit of an entity other than MMI.

108.　By reason of the above, MMI has suffered damages, including lost profits and damages to its goodwill and reputation, in an amount which cannot be determined with certainty at this time but is believed to be in excess of $15,000.00.

109.　Pursuant to §542.335, Fla. Stats. and pursuant to Padula's Employment Agreement with MMI, MMI is entitled to an award of its reasonable attorneys' fees and costs incurred herein.

**WHEREFORE,** MMI requests that this Court enter Judgment for MMI and against Padula:

(a)　awarding MMI all damages caused by Padula's violation of her respective agreement with MMI  according to proof at trial, together with interest and costs;

(b)　awarding MMI its attorneys' fees; and

- 26 -

(c)     awarding MMI such other and further relief as the Court may deem just and

proper.

## COUNT VIII
## DAMAGES FOR TORTIOUS INTERFERENCE WITH
## BUSINESS AND CONTRACTUAL RELATIONSHIPS
## (ALL DEFENDANTS)

110.    This is an action for damages against Padula and Elite for tortious interference

with business and contractual relationships, for damages in excess of $15,000, exclusive of

interest, costs and attorneys' fees, for breach of contract.

111.    MMI realleges and incorporates by reference the allegations set forth in

Paragraphs 1 through 68 above as if fully set forth herein.

112.    MMI has ongoing and advantageous business relationships with its customers and

employees, including, but not limited to, The Classic, Casa Del Mar, Fountainview, Lake Worth

Gardens, Newport Place / Pointe, Park Summit, and Sunrise Atrium.  Padula, Elite and Carter

had knowledge of the relationships and contracts with these and other facilities with similar

contractual relationships.

113.    Elite knew or reasonably should have known that Carter was party to an

agreement precluding disclosure of confidential information and competition with MMI and that

Padula was a party to a non competition agreement..

114.    One or more of the Defendants engaged in an orchestrated effort to raid

employees and business of MMI, interfere with Mobile Medical's reasonable and continued

contractual relationships and expectancies, and disrupt operations of MMI.

115.    Upon information and belief, and by reason of the above, Padula, Carter and/or

Elite have intentionally and unjustifiably interfered with MMI's business relationships and

expectancies with one or more of its customers and/or employees, by unlawful and improper means, including by using MMI's Confidential Information to divert and/or seek to divert employees, and engaging in breaches of Carter's and Padula's duty of loyalty to Mobile Medical.

116.    Defendants' actions as alleged herein were upon information and belief intended to impair, impede and damage MMI's legitimate business interests by unlawful means. Such conduct is without justification and constitutes an unlawful, tortious, wrongful, unfair, intentional and malicious interference with MMI's rights and legitimate business interests.

117.    By reason of the above, MMI has suffered damages, including lost profits and damages to its goodwill and reputation, in an amount which cannot be determined with certainty at this time but is believed to be in excess of $15,000.00.

**WHEREFORE**, MMI prays that this Court enter judgment against Defendants and in favor of MMI:

(a)     awarding MMI all damages caused by the conduct of Defendants as alleged herein according to proof at trial, together with interest and costs; and

(b)     awarding MMI such other and further relief as this Court deems just.

## COUNT IX
### INJUNCTIVE RELIEF FOR TORTIOUS INTERFERENCE WITH BUSINESS AND CONTRACTUAL RELATIONSHIPS
### (ALL DEFENDANTS)

118.    This is an action for injunctive relief against Defendants for tortious interference with business and contractual relationships.

119.    MMI realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 68, 112-117 above as if fully set forth herein.

120.   MMI has ongoing and advantageous business relationships with its customers and employees, including, but not limited to, The Classic, Casa Del Mar, Fountainview, Lake Worth Gardens, Newport Place / Pointe, Park Summit, and Sunrise Atrium, and employees working at those facilities.  Padula, Elite and Carter have knowledge of many of these relationships.

121.   By reason of the above, Defendant wrongly interfered with one or more contractual relationships and/or expectancies of Mobile Medical, and MMI has been damaged thereby.

122.   Unless Defendants are enjoined by this Court from interfering with MMI's relationships and expectancies with its employees, customers and accounts, MMI will suffer irreparable injury and harm for which it lacks an adequate remedy of law.

123.   MMI has been and is likely to continue to be substantially and irreparably injured in its business, and the threat of continued injury to its business, customer relations, employee relations and referral source relations, and the attendant goodwill outweighs any harm the issuance of an injunction may cause the Defendants.

124.   MMI has a substantial likelihood of success on the merits of its claims against the Defendants.

**WHEREFORE**, MMI prays that this Court enter judgment against Defendants and in favor of MMI:

(a)      temporarily, preliminarily and permanently enjoining Defendants, and all persons acting by through or in concert with them, from:

(i)      Hiring or recruiting any employees of MMI, or employing any MMI employee under conditions that would cause or allow them to violate the terms of any agreement between MMI and that individual; or

(ii)     Interfering with any business relationship between MMI and any customer

with whom Carter or Padula had any relationship during their MMI

employment, including but not limited to The Classic, Fountainview, Lake

Worth Gardens and Park Summit;

(iii)    Entering into any Agreement with The Classic, Casa Del Mar,

Fountainview, Lake Worth Gardens, Newport Place / Pointe, Park

Summit, and Sunrise Atrium or providing any services to or at The

Classic, Casa Del Mar, Fountainview, Lake Worth Gardens, Newport

Place / Pointe, Park Summit, and Sunrise Atrium; and

(b)     awarding MMI such other and further relief as this Court deems just.

## COUNT X
## INJUNCTIVE RELIEF CIVIL CONSPIRACY
## (ALL DEFENDANTS)

125.     MMI incorporates and realleges herein paragraphs 1-68, 112-117 set forth above,

as if fully set forth herein.

126.     By reason of the above, and upon information and belief, Padula, Carter, and/or

Elite have conspired to misappropriate trade secrets of MMI, interfere with and undermine

MMI's contractual relationships and expectancies with customers, accounts and employees,

recruit away and/or raid from MMI, key employees as described above, recruit away business of

MMI, and violate Carter's and Padula's respective duties of loyalty to MMI.

127.     Defendants' conduct was unlawful, and caused and/or enabled Carter and Padula

to violate their contractual and legal obligations to MMI.

128.    Defendants' conspiracy upon information and belief was made for the purpose of misappropriating MMI's trade secrets, business, employees and customers for Elite's use and benefit.

129.    Defendants' conduct was unlawful, and caused and/or enabled Carter and Padula to violate their contractual and legal obligations to MMI.

130.    Defendants' conspiracy was made for the purpose of misappropriating MMI's trade secrets and customers for Elite's use and benefit. Unless Defendants are enjoined by this Court from interfering with MMI's relationships and expectancies with its employees, customers and accounts, MMI will suffer irreparable injury and harm for which it lacks an adequate remedy of law.

131.    MMI has been and is likely to continue to be substantially and irreparably injured in its business, and the threat of continued injury to its business, customer relations, employee relations and referral source relations, and the attendant goodwill outweighs any harm the issuance of an injunction may cause the Defendants.

132.    MMI has a substantial likelihood of success on the merits of its claims against the Defendants.

WHEREFORE, MMI requests this Court:

(a)    enter a temporary, preliminary and permanent injunction enjoining Defendants, and all persons acting by, through or in concert with them, from further conspiratorial conduct with respect to MMI's trade secrets and contractual relationships; and

(c)    grant MMI such other and further relief as the Court may deem just and proper.

## COUNT XI
## DAMAGES CIVIL CONSPIRACY
## (ALL DEFENDANTS)

- 31 -

133.    MMI incorporates and realleges herein paragraphs 1-67, 112-117, and 120-131 set forth above, as if fully set forth herein.

134.    Defendants' conduct was unlawful, and caused and/or enabled Carter and Padula to violate their contractual and legal obligations to MMI.

135.    Defendants' conspiracy was made for the purpose of misappropriating MMI's trade secrets and customers for Elite's use and benefit.

WHEREFORE, MMI requests this Court:

(a)     enter judgment in favor of MMI and against Defendants for all damages suffered by MMI as a direct and proximate result of Defendants' conduct according to proof at trial, including but not limited to compensatory and punitive damages in an amount to be determined by the Court; together with interest, and costs of this suit; and

(b) grant MMI such other and further relief as the Court may deem just and proper.

## COUNT XII
## INJUNCTIVE RELIEF - TRESPASS (ALL DEFENDANTS)

136.    MMI incorporates and realleges herein paragraphs 1-68 set forth above, as if fully set forth herein.

137.    By virtue of the above actions, Padula unlawfully entered and used MMI's property without right or authority and in disruption of MMI's ordinary business operations and trespassed on MMI's property, to MMI's damage and injury. Padula knew or reasonably should have known that he had no right to trespass on or use MMI's property

138.    Unless enjoined, further similar conduct by Padula at any of MMI's facilities would cause immediate and irreparable harm for which there is no adequate remedy at law, as

damages resulting from such a disruption of MMI's business activities would be difficult to ascertain with any certainty.

139.    MMI has been and is likely to continue to be substantially and irreparably injured in its business by reason of Padula's actions, and the threat of continued injury to its business, customer relations, employee relations and referral source relations, and the attendant goodwill outweighs any harm the issuance of an injunction may cause the Defendants.

140.    MMI has a substantial likelihood of success on the merits of its trespass claim.

WHEREFORE, MMI requests this Court temporarily, preliminarily and permanently enjoin Defendants from

(a) entering or using the property of MMI without MMI's express consent, including MMI's facilities at The Classic, Casa Del Mar, Fountainview, Lake Worth Gardens, Newport Place / Pointe, Park Summit, and Sunrise Atrium; and

(b) grant MMI such other and further relief as the Court may deem just and proper.

## COUNT XII
## DAMAGES - TRESPASS (ALL DEFENDANTS)

141.    MMI incorporates and realleges herein paragraphs 1-68 set forth above, as if fully set forth herein.

142.    By virtue of the above actions, Padula unlawfully entered and used MMI's property without right or authority and in disruption of MMI's ordinary business operations, and MMI has been damaged and injured thereby in an amount which cannot be determined with certainty at this time.

143.    The conduct of Padula in trespassing on MMI's property was willful and intentional and/or in reckless disregard of MMI's rights and interests.

WHEREFORE, MMI requests this Court award MMI

(a) compensatory and punitive damages arising from Padula's interruption of MMI's business operations as a direct and proximate result of his unauthorized use and entry of MMI's property, according to proof at trial; and

(b) grant MMI such other and further relief as the Court may deem just and proper.

Respectfully submitted,

HOLLAND & KNIGHT LLP
222 Lakeview Avenue, Suite 1000
West Palm Beach, FL 33401
Telephone:    561-650-8300
Facsimile:    561-650-8399

Hank Jackson
Florida Bar No. 866717
Thomas H. Loffredo
Florida Bar No. 0870323

and

THOMPSON COBURN LLP
Charles M. Poplstein, MO#30803
Laura M. Jordan, MO#48755
One US Bank Plaza
St. Louis, Missouri  63101
314-552-6000
FAX 314-552-7000

Attorneys for Plaintiff
Mobile Medical Industries, Inc.

State of Florida     )
                    )
County of Palm Beach)

## VERIFICATION

I, _Ellen Pentland_ being duly sworn, say that I am a√ *employee ε officer*

of Mobile Medical Industries, Inc., and am authorized by and on behalf of Mobile Medical

Industries, Inc. to execute this verification on its behalf.  I have reviewed the First Amended

Verified Complaint, and its factual contents are true and correct to the best of my knowledge,

information and belief.

_Ellen Pentland_

Subscribed and sworn to before me this 29 day of _Dec_ , _2004_ .

_Kesha B_____

Notary Public

Kesha Brown
My Commission DD056301
Expires September 11 2006

# 2468144_v1

- 35 -

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

**TXu 1 – 204 – 772**

EFFECTIVE DATE OF REGISTRATION

| 12 | 10 | 2004 |
|---|---|---|
| Month | Day | Year |

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**

RISK MANAGEMENT POLICIES AND PROCEDURES

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    **Title of Collective Work ▼**

If published in a periodical or serial give: Volume ▼      Number ▼      Issue Date ▼      On Pages ▼

## 2

**a**

**NAME OF AUTHOR ▼**

Mobile Medical Industries, Inc.

**DATES OF BIRTH AND DEATH**
Year Born ▼      Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶ United States of America

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Entire Text

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼      Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼      Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

## 3

**a**

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given
2004
◀ Year in all cases.

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information Month ▶      Day ▶      Year ▶
ONLY if this work has been published.      ◀ Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Mobile Medical Industries, Inc.
2500 Quantum Lakes Drive, Suite 108
Boynton Beach, FL 33426

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the

**APPLICATION RECEIVED**
DEC 10, 2004
**ONE DEPOSIT RECEIVED**
DEC 10, 2004
**TWO DEPOSITS RECEIVED**

**FUNDS RECEIVED**

See instructions before completing this space.

---

EXHIBIT
1

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.      • Sign the form at line 8.

**DO NOT WRITE HERE**
Page 1 of _____ pages

| | |
|---|---|
| EXAMINED BY | FORM TX |
| CHECKED BY | |
| CORRESPONDENCE ☐ Yes | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☑ No. If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

**5**

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number ▶**      **Year of Registration ▶**

**DERIVATIVE WORK OR COMPILATION**

**6**

**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

a

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

b

See instructions before completing this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name ▼**

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

b

Thomas A. Polcyn, Thompson Coburn, LLP
One US Bank Plaza
St. Louis, MO 63101

Area code and daytime telephone number ▶ 314-552-6000          Fax number ▶ 314-552-7000

Email ▶ ipdocket@thompsoncoburn.com

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the

**8**

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of ___ Medical Industries, Inc.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**Typed or printed name and date ▼** If this application gives a date of publication in space 3, do not sign and submit it before that date.

Thomas A. Polcyn          Date ▶ December 8, 2004

Handwritten signature (X) ▼

X _____

**9**

Certificate will be mailed in window envelope to this address:

Name ▼
Thomas A. Polcyn, Thompson Coburn, LLP

Number/Street/Apt ▼
One US Bank Plaza

City/State/ZIP ▼
St. Louis, MO 63101

YOU MUST:
• Complete all necessary spaces
• Sign your application in space 8

SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

MAIL TO:
Library of Congress
Copyright Office · TX
101 Independence Avenue, S.E.
Washington, D.C. 20559-6222

Fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000.

\*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

## NON-DISCLOSURE/CONFIDENTIALITY AGREEMENT

Michelle Carter acknowledges that Company property includes not only tangible property, like desks, typewriters and computers, but also intangible property such as information. Of particular importance is proprietary and confidential information. Proprietary information includes all information obtained by Company employees or independent contractors during the course of their work. Confidential information is any company information that is not known generally to the public or industry. Customer lists, customer files, personnel files, payroll and/or compensation records, computer records, financial and marketing data, process descriptions, research plans, formulas, and trade secrets are examples of confidential information.

The undersigned, in consideration of his/her continued employment by the Company or continued relationship as an independent contractor of the Company, hereby agrees:

1. Not to use or disclose any proprietary or confidential information that he/she obtains while performing work for the Company, except as required for business reasons. This obligation remains even after the employment relationship or independent contractor relationship with the Company ends.

2. Not to divulge any trade secret, client list, price list, supplier list or any other useful information gained or taken from any Company.

3. Not to divulge any personal, financial, or corporate information regarding the Company's clients, employees or patients.

4. Not to divulge any personal, financial, or medical information regarding the Company's patients. Not to discuss what you see or hear in a patient's home with co-workers or other patients. If you see or hear something that you feel will be detrimental to the patient's health or well-being, call the office and discuss the matter with the nursing supervisor. The undersigned hereby also agrees not to discuss personal problems or your pay rate with the patient or their family and not to argue with a patient, family member or hospital staff. Call the office if any problems arise.

Failure to comply with this Agreement could result in termination, as well as in legal action to recover from and/or prevent any harm to the Company. In the event the undersigned has any question as to whether particular information is subject to this Agreement, the undersigned agrees to consult with Donna Bly prior to disclosing the information.

If, due to a breach of this Agreement by the undersigned, court action is necessary, the undersigned will be responsible for all attorney's fees and court costs incurred by the Company. This Agreement shall be construed in accordance with the laws of the State of Florida. In the event that any part of this Agreement shall be held unenforceable or invalid, the remaining parts thereof shall nevertheless continue to be enforceable as though the invalid portions were not a part hereof.

DATED this 18th day of MARCH , 19 99

Michelle Carter
EMPLOYEE or INDEPENDENT CONTRACTOR



**EXHIBIT**

2

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "Agreement") is made and entered into this 9th day of October, 2000, by and between **MOBILE MEDICAL INDUSTRIES, L.L.C.,** a Delaware limited liability company d/b/a **MD TO YOU** (**"EMPLOYER"**), and James Padula, D.O. ("Employee").

### RECITALS

A.       Employer provides certain medical services to patients in their homes, assisted living and independent living facilities or other locations.

B.       Employee is duly licensed to practice medicine in the State of Florida and is board certified or board eligible in Family Practice.

C.       Employer desires to hire Employee as a physician and Employee accepts such employment, commencing as of October 23rd, 2000 (the "Effective Date") upon the terms and conditions in this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employer and Employee, intending to become legally bound, agree:

### ARTICLE I
### INCORPORATION OF RECITALS

1.1     **Recitals**.  The above recitals are true and correct and are incorporated herein in their entirety.

### ARTICLE II
### ENGAGEMENT

2.1     **Engagement**.  Employer hereby employs Employee, and Employee accepts such employment, as a physician to render medical services on behalf of Employer, in accordance with the terms and conditions of this Agreement.

### ARTICLE III
### TERM AND TERMINATION

3.1     **Term**.  The term of the Agreement shall be for one year (the "Term"), commencing on the Effective Date, subject to prior termination as provided herein.

3.2     **Early Termination**.  The Term shall terminate upon the first to occur of any of the following:

**EXHIBIT**

3

3.2.1   **Breach, Default or Violation.**  Upon written notice by either party to the other, if the other party is in any material respect in breach, default or violation of any provision of this Agreement (if such breach, default or violation is capable of being cured) and fails to cure such material breach, default or violation within 10 days after written notice from the non-breaching party to do so

3.2.2   **For Cause.**  Upon written notice from Employer "for cause." "For cause" shall include Employee conducting himself or herself in an unethical, immoral, criminal or fraudulent manner (other than a driving-related misdemeanor) which act is detrimental to Employer; Employee's suspension or termination of Medicare or Medicaid participation by the Department of Health and Human Services; the restriction, suspension or termination (whether with probation or without) of Employee's license to practice medicine by the Florida Board of Medicine; Employee is sanctioned by any peer review organization; Employee's relinquishment of his or her license to practice medicine under threat of disciplinary action; the restriction, suspension or termination (whether with probation or without) of any Drug Enforcement Agency License of Employee to prescribe controlled substances; or conduct of Employee which is adverse to the business interests, reputation or goodwill of Employer.

3.2.3   **Without Cause.**  Upon 60 days prior written notice by either party to the other party.

3.2.4   **Disability.**  Upon Employee's Disability (as hereinafter defined).  For purposes hereof, "Disability" shall be defined in Employee's individual disability policy existing from time to time, a copy of which has been supplied to Employer prior to the commencement of the Disability.  Otherwise, Disability shall mean the physical or mental inability of Employee to perform medical services for Employer as required hereunder with reasonable accommodation by Employer.

3.2.5   **Death.**  Upon the death of Employee.

3.3   **Effect of Termination or Expiration.**  Upon the termination or expiration of this Agreement for any reason with notice, the parties agree Employer's sole obligation to Employee shall be the payment to Employee of any accrued, but unpaid Compensation (defined in Subsection 5.1 below).  Upon such termination, Employee agrees to credit to Employer all sums prepaid by Employer, including, but not limited to, salary advances, dues, fees, insurance, or sums advanced for per diem expenses.  All of such sums shall be subtracted from Employee's last paycheck from Employer.

### ARTICLE IV
### DUTIES AND SERVICES

4.1   **Services.**  Employee agrees to provide medical services on behalf of Employer in accordance with the schedule set forth in **Schedule 4.1A,** attached hereto and incorporated herein. Employee agrees to perform all of Employee's duties and responsibilities hereunder in a diligent and competent manner.

2

4.2     **Locations for Services**.  Employee agrees that he shall perform his duties at the locations as may be determined by Employer.

4.3     **Exclusive Practice**.  During the Term, Employee agrees not to engage in any medical professional business activity (whether or not such business activity is pursued for gain, profit or other pecuniary advantage), without the prior written consent of Employer.   All remuneration and accounts receivable arising from or related to Employee's provision of any medical services are the property of Employer and Employee agrees to take all reasonable actions requested by Employer to assist in the collection of accounts receivable for such services provided by Employee and Employee agrees to provide to Employer any such remuneration immediately after it is received by Employee.

4.4     **Workplace Rules**.     Employee shall observe and comply with the rules, regulations, policies and procedures established by Employer respecting the performance of Employee's duties, and will carry out and perform services according to the directions and policies announced to Employee from time to time by Employer, either orally or in writing. Employee specifically understands that Employer shall have final authority over the acceptance or refusal of any person for whom professional services may be rendered and over the assignment of patients to Employee.

4.5     **Managed Care.**  Employer believes that a significant portion of its revenues may be realized through managed care contracts and that managed care contracts are valuable assets of Employer.  Employee will do nothing to impair the existence or value of any managed care contract, and shall not execute or deliver medical services pursuant to any managed care contract without the prior written consent of Employer.  Further, Employee will execute any managed care contract reasonably requested by Employer necessary to allow Employee to render medical services pursuant to such managed care contract.

4.6     **Other Services**.  During the Term, Employee agrees to render other services and duties related to Employer's operations as may be assigned to Employee, without limitation.

4.7     **Standard of Professional Services**.  Employee shall perform patient care and service the needs of the patients within the generally accepted standards of the profession of medicine applicable at the time of treatment.  Employee shall not be required to perform medical services outside of the normal community standards.  Employee has complete control over the diagnosis and treatment of each patient he or she treats.  Employer shall not, in any manner, interfere with this right of Employee.  In connection with the provision of professional services to patients of Employer, Employee shall use the equipment, instruments, pharmaceuticals and supplies furnished by or on behalf of Employer for the purposes for which they are intended and in a manner consistent with sound medical practice.

4.8     **Canons of Professional Ethics**.  It is expressly understood and agreed that, with respect to medical services, Employee is bound by the applicable Canons of Professional Ethics and the provisions of Chapter 458, Florida Statutes, and the regulations promulgated thereunder, as from time to time amended, and Employee shall at all times be acting and performing such services with professional independence.  Employee shall avoid all acts, habits and usage which

3

might injure in any way, directly or indirectly, the professional reputation of Employer or any of the physicians or employees of Employer.

4.9     **Compliance With Other Rules and Regulations**.  All applicable provisions of law and other rules and regulations of all governmental authorities relating to licensure and regulation of physicians and relevant recommendations of applicable accrediting organizations shall be fully complied with by Employee.  Employee shall not take any action that would jeopardize Employer's operating license or status as a participating Medicare or Medicaid provider of services.

4.10     **Medical Records**.  Employee shall keep and maintain at the offices of Employer (or cause to be kept and maintained) appropriate records, consistent with prevailing standards of medical practice in Employee's relevant community, relating to all professional services rendered by Employee under this Agreement and shall prepare and attend to, in connection with such services, all reports, claims, demands, damages and correspondence necessary or appropriate in the circumstances, as determined solely by Employer, all of which records, reports, claims, and correspondence shall belong to Employer.

4.11     **Audit**.  Employee agrees to cooperate in any audit or investigation concerning services performed by Employee.

4.12     **No Obligations**.  Employee agrees that he will not enter into any transaction which obligates Employer to pay for goods and services without Employer's prior written consent.  Any such obligation incurred without Employer's consent shall be the sole obligation and expense of Employee.

**ARTICLE V**
**COMPENSATION AND BENEFITS**

5.1     **Compensation**. Employee shall be paid compensation ("Compensation") in the amount of $5,000 bi-weekly plus $500 for each Saturdays worked.  Compensation shall be payable to Employee in equal bi-weekly installments or in accordance with such other pay periods established from time to time by Employer which are applicable to all of its physician-employees.  Employer will reimburse Employee for all reasonable and approved expenses incurred by Employee in connection with the performance hereunder upon receipt of vouchers prepared in accordance with the Employers regular reimbursement procedures and practices.

5.2     **Benefits**.  Employee shall be entitled to receive those benefits set forth on **Schedule 5.2** attached hereto, so long as Employee is otherwise eligible to participate and desires to be covered and participate.

5.3     **Income and Employment Taxes**.  Employee shall be an employee of Employer for all purposes.   Employer shall withhold amounts from Employee's Compensation in accordance with the requirements of applicable law for federal and state income tax, FICA, FUTA, and other employment or payroll tax purposes.  It shall be Employee's responsibility to report and pay all federal, state, and local taxes arising from Employee's receipt of Employee's Compensation hereunder.

4

## ARTICLE VI
### INSURANCE

6.1    **Medical Liability Insurance**.    Employer shall provide Employee with professional medical liability insurance, with minimum coverage of $1,000,000 per occurrence with a yearly maximum of $3,000,000 in the aggregate, or such other amounts as may be determined from time to time by Employer, provided that Employer shall be added as an additional named insured. Such coverage shall be limited to the professional duties or activities that Employee renders pursuant to this Agreement.

6.2    **Prior Acts Coverage.**    Employee shall be responsible for obtaining and maintaining prior acts coverage for covering medical malpractice claims made for Employee's medical services rendered prior to the Effective Date in the coverage limits set forth in Subsection 6.1 above.

6.3    **Tail Coverage**. Upon the expiration or the earlier termination of this Agreement for any reason other than pursuant to Paragraph 3.2.3 if Employer terminates Employee with cause, Employee shall either maintain any claims-made insurance for a period of four years or purchase and pay for tail insurance covering medical malpractice claims made following the termination or expiration of the Agreement that relate to services rendered by Employee to patients of Employer during the Term. Employee shall continue to maintain Employer as an additional named insured. Within 15 days after such termination, Employee shall submit proof to Employer of having obtained such tail insurance. The parties hereby agree that any tail insurance purchased pursuant to the terms of this Subsection 6.3 shall provide minimum coverage in the per occurrence and aggregate amounts equal to the coverage limits in effect at the time of the expiration or termination of this Agreement. If Employer terminates Employee without cause pursuant to Paragraph 3.2.3, Employer agrees to pay 50% of the cost of the tail coverage required herein.

6.4    **Automobile Insurance**. Employee shall carry, at Employee's expense, automobile insurance and liability and personal injury insurance and shall, when requested by Employer, submit proof thereof to Employer.

## ARTICLE VII
### REPRESENTATIONS AND WARRANTIES

Employee represents and warrants that:

7.1    Employee is duly licensed and registered and in good standing under the laws of the State of Florida to engage in the practice of medicine, and such license and registration have not been suspended, revoked or restricted in any manner.

7.2    Employee has current controlled substances registrations issued by the State of Florida and the United States Drug Enforcement Administration ("DEA"), if applicable, which registrations have not been surrendered, suspended, revoked or restricted in any manner.

7.3    Employee shall maintain in good standing his or her license to practice medicine and DEA registration.

5

7.4     Employee has disclosed to Employer on **Schedule 7.4** hereto the following matters, which occurred at any time prior to the Effective Date and shall immediately disclose to Employer if any of the following matters occur during the Term:

7.4.1   Any actual or threatened malpractice suit, claim (whether or not filed in court), settlement, settlement allocation, judgment, verdict or decree against Employee;

7.4.2   Any disciplinary, peer review or professional review investigation, proceeding or action instituted against Employee by any licensure board, hospital, medical school, health care facility or entity, professional society or association, third party payor, peer review or professional review committee or body, or governmental agency;

7.4.3   Any criminal complaint, indictment or criminal proceeding in which Employee is named as a defendant;

7.4.4   Any investigation or proceeding, whether administrative, civil or criminal, relating to an allegation against Employee of filing false health care claims, violating anti-kickback laws, violating fee-splitting laws, or engaging in other billing improprieties;

7.4.5   Any organic or mental illness or condition that impairs or is likely to impair Employee's ability to practice medicine;

7.4.6   Any dependency on, or habitual use or abuse of, alcohol or controlled substances, or any participation in any alcohol or controlled substance detoxification, treatment, recovery, rehabilitation, counseling, screening or monitoring program;

7.4.7   Any allegation or any investigation or proceeding based on any allegation against Employee for violating professional ethics or standards, or engaging in illegal, immoral or other misconduct (of any nature or degree), relating to the practice of medicine; or

7.4.8   Any denial or withdrawal of an application in any state for licensure as a physician, for medical staff privileges at any hospital or other health care entity, for recertification, for participation in any third-party payment program, for state or federal controlled substances registration, or for malpractice insurance, or loss of board certification in Family Practice for any reason whatsoever.

7.5     Employee is board certified or board eligible in Family Practice.

## ARTICLE VIII
## DISCLOSURE OF INFORMATION

8.1     **Charts and Records.** All of Employer's books and records, including accounts receivable records, patient records, patient charts, professional records, patient lists and patients' telephone numbers shall be the sole and exclusive property of Employer. Employee, shall have no right whatsoever to Employer's books, records and patient charts. Upon the expiration or termination of this Agreement, for any cause whatsoever, Employee shall surrender to Employer, in good condition, any record or records kept by Employee containing the names, addresses and

6

other information with respect to patients or potential patients of Employer which have been served or treated by Employee.

8.2     **Disclosure of Information**.  Employee recognizes and acknowledges that all records, files, reports, protocols, policies, manuals, databases, processes, procedures, computer systems, materials and other documents pertaining to services rendered by Employee hereunder, or to the operations of Employer, belong to and shall remain the property of Employer and constitute proprietary information and trade secrets of Employer.  Employee recognizes and acknowledges that the terms of this Agreement, as well as Employer's proprietary information and trade secrets as they may exist from time to time, are valuable, special, and unique assets of Employer's business.  Employee shall not, during or after the Term, disclose such proprietary information of Employer or trade secrets of Employer to any other firm, person, corporation, association or other entity for any reason or purpose whatsoever, or use such information for his own benefit, without the prior written consent of Employer.

8.3     **Discoveries and Inventions**.  Employee acknowledges that he or she has no right to or any interest in any systems, product designs, inventions, discoveries, developments, improvements, techniques, designs, data, and all other work products whether tangible or intangible, which Employee conceives, reduces to practice or otherwise creates either alone or with others in the course of or otherwise related to his or her employment with Employer.  Such items, within the scope of MD To You services and business, belong to Employer and Employee by execution of this Agreement assigns any interest he or she may have in such items to Employer.  Employee further agrees to use his or her best efforts to perform all acts necessary to enable Employer to learn of and protect the right to these items, including but not limited to making full and immediate disclosure to Employer and assisting in the preparation and execution of all documents required to acquire and convey to Employer a patent and/or copyright protection in the United States and elsewhere.

8.4     **Enforcement**.  Employee agrees that enforcement of this Article VIII may be through injunction, without the necessity of posting bond, in addition to all other remedies that may be available at law or in equity.

## ARTICLE IX
## FEES

9.1     **Fees for Services**.  All fees, compensation, monies, and other things of value received or realized as a result of the rendering of medical services by Employee, pursuant to this Agreement, shall belong to and be paid and delivered to Employer.

9.2     **Setting of Fees**.  Employer shall have the sole authority to determine the amount of fees to be charged any patient for professional services upon consultation with Employee.

9.3     **Billing and Collection**.  Employee agrees that, during the Term, Employee shall not bill to or collect from any patient or third party payor any amount for services rendered hereunder.  Employee hereby irrevocably assigns and grants to Employer the right to bill and collect from patients or third party payors for all services rendered by Employee hereunder, regardless of the location where any such services may be rendered by Employee.  Employee

7

agrees to execute any and all documents deemed necessary or desirable by Employer to carry out the provision of this Subsection. Employer shall use its customary and usual procedures, in the ordinary course of business, to collect fees derived from medical and professional services

## ARTICLE X
## RESTRICTIVE COVENANTS

10.1    **Covenants Not to Compete.** As a result of Employee's employment, Employee will have access to confidential information of Employer, Employee will develop patients, Employee will learn additional skills and training, and as further material inducement to Employer to employ Employee, Employee hereby agrees that, during the Term and for a period of two years thereafter (whether by expiration of the Term or any renewals or termination for any reason), Employee shall not (i) engage in the practice of medicine for a business or company which provides, distributes markets, promotes, or advertises mobile physician medical services within a radius of 50 miles from any office of Employer; (ii) accept employment with, or otherwise provide services for or own any interest in, a business or company which provides, distributes, markets, promotes, or advertises mobile physician medical services within a radius of 50 miles from any office of Employer; or (iii) perform services directly or indirectly for any facility for which Employer provided services during the Term. Such two year period shall be extended by any period of time during which Employee shall be or shall have been in breach of such covenant (plus the period of any temporary restraining order or other preliminary order preventing immediate enforcement hereof).

10.2    **Covenant Not to Solicit.** Employee further agrees that, upon expiration or termination of this Agreement for any reason, Employee shall not contact, solicit or attempt to contact or solicit any patient previously treated by Employer, or any facility for which Employer provided services during the Term, including, without limitation, by means of any direct mailings or announcements, and Employee shall not employ or otherwise engage any person who was employed or engaged by Employer at any time during the six months prior to the date of termination or expiration.

10.3    **Remedies.** Employee agrees that, if Employee shall violate any of the agreements provided for pursuant to the foregoing Subsections, Employer shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration or benefits which Employee directly or indirectly has realized and/or may realize as a result of, growing out of or in connection with any such violation. Such remedy shall be in addition to and not in limitation of any injunctive relief or other rights or remedies to which Employer may be entitled at law or in equity or under this Agreement. It is specifically agreed that, if Employee attempts to or does act in contravention of this Article, Employer shall suffer irreparable injury and Employer shall be entitled to obtain preliminary and permanent injunctive relief prohibiting such practice without the necessity of posting a bond, in addition to any damages which are suffered, together with reasonable attorneys' fees and other costs in connection with any such litigation. With respect to any action by Employer for injunctive relief pursuant to this Article, Employee hereby acknowledges that there is no adequate remedy at law and waives any defense to such action on the grounds of failure of Employer to show irreparable injury from Employee's breach of this Article.

8

10.4   **Reasonableness of Restrictions**.  Employee has carefully read and considered the provision of this Article and, having done so, agrees that the restrictions and remedies set forth in this Article (including, but no limited to, the time of restriction, the geographical area of restriction and the damages and injunction relief provisions herein) are fair and reasonable and are reasonably required for the protection of the legitimate business interest of Employer.

10.5   **Reduction by Court**.  The parties agree that if either the time period or the geographic area is deemed too restrictive by any court of competent jurisdiction in any proceeding involving the validity of said covenants, the court may reduce the offending restriction to the maximum restriction it deems reasonable under the circumstances. The parties agree that if any provision of the Article is held to be invalid or against public policy, the remaining provisions of the Article are severable and shall not be affected thereby.

10.6   **Liquidated Damages**.  Employer has the right to seek liquidated damages in addition to any other remedies.  Employer and Employee agree that the damage to the business of Employee by virtue of a breach of this Article herein by Employee is impossible to ascertain with any certainty.

10.7   **Third Party Beneficiaries**.  Employee and or its stockholders are entitled to enforce the covenants in this Article.

## ARTICLE XI
## MISCELLANEOUS

11.1   **Notices**.  All notices required or permitted to be given under the terms of this Agreement shall be in writing, and shall be effective upon delivery if delivered to the addressee in person, effective two days after mailing if mailed by certified mail, postage prepared, return receipt requested, or effective the next business day if mailed by overnight courier with charges prepaid, as follows:

| | |
|---|---|
| If to Employer: | Mobile Medical Industries, L.L.C.<br>777 Yamato Road, Suite 330<br>Boca Raton, Florida 33431<br>Attn: Denise White |
| With a copy to: | Broad & Cassel<br>500 East Broward Blvd., Suite 1130<br>Fort Lauderdale, Florida 33394<br>Attn: Jodi B. Laurence, Esq. |
| If to Employee: | James Padula, D.O.<br>4603 Hammock Circle<br>Delray Beach, FL 33445 |

9

With a copy to:                           Gary M. Mills, P.A.
                                          1761 W. Hillsboro Blvd., Suite 104
                                          Deerfield Beach, FL 33442

or to such other address as either party shall have designated for notices to be given to him or it
in accordance with this Article.

11.2   **Severability**.  If any provision of this Agreement shall be held invalid or
unenforceable, the remainder of this Agreement shall nevertheless remain in full force and effect.
If any provision of this Agreement shall be held invalid or unenforceable under any particular
circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

11.3   **Assignment**.  Employer may assign all of its rights and duties under this
Agreement without recourse.  Employee may not assign his rights or duties herein without the
prior written consent of Employer.  Any such assignment by Employee without the prior written
consent of Employer shall be null and void.

11.4   **Attorneys' Fees**.  If any litigation or arbitration arises as a result of the terms,
conditions or provisions of this Agreement, the prevailing party shall be entitled to recover from
the non-prevailing party all reasonable attorneys' fees and paralegals' fees at all levels of
arbitration and at all trial and appellate levels, as well as all costs and expenses.

11.5   **Governing Law and Venue**.  This Agreement shall be governed by, and
construed and enforced in accordance with, the laws of the State of Florida.  Any action or claim
arising from, under or pursuant to this Agreement shall be brought in the courts, state or federal,
within the State of Florida, and the parties expressly waive the right to bring any legal action or
claims in any other courts.  The parties hereto hereby consent to venue in any state or federal
court within the State of Florida having jurisdiction over Palm Beach County for all purposes in
connection with any action or proceeding commenced between the parties hereto in connection
with or arising from this Agreement.

11.6   **Legislative Amendments**.  Notwithstanding anything to the contrary herein, this
Agreement shall be automatically amended as necessary to comply with applicable federal or
state laws or regulations, including without limitation, any applicable laws or regulations under
the Medicare and/or Medicaid Programs.

11.7   **Construction**.  This Agreement shall be interpreted without regard to any
presumption or rule requiring construction against the party causing this Agreement to be
drafted.

11.8   **Waiver**.  Any waiver by any party hereto of a breach of any provision of this
Agreement shall not operate or be construed as a waiver of any other provision hereof and shall
not be effective at all unless in writing.  A waiver of any of the terms and conditions hereof shall
not be construed as a general waiver by either party, and such waiving party shall be free to
reinstate any such term or condition, with or without notice to the other party.

10

11.9  **Entire Agreement/Amendment**. This Agreement contains the entire agreement between the parties hereto. No change, addition, or amendment shall be made except by written agreement executed by all of the parties hereto.

11.10  **Survival**. The provisions of this Agreement shall survive the termination of Employee's relationship with Employer and the assignment of this Agreement by Employer to any successor or assign.

11.11  **Expenses**. Each party to this Agreement shall pay its or his own costs and expenses in connection with the transaction contemplated hereby.

11.12  **Counterparts**. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.13  **Benefit**. This Agreement shall bind and inure to the benefit of the parties named herein and their respective successors and assigns. Neither party hereto may assign any rights, benefits, duties or obligations under this Agreement without the prior written consent of the other party; provided, however, that Employer may, without the consent of Employee, assign all of its rights, benefits, duties or obligations under this Agreement to any of Employer's Affiliates.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.

**Employer:**

**MOBILE MEDICAL INDUSTRIES, L.L.C., a Delaware limited liability company, d/b/a MD TO YOU**

By: _____
Name: _____
Title: _____

**Employee:**

_____

*F:\USERS\SHARED\MDtoYou\Employment Agreements\Dr. James Padula, D.O..doc*

11

## SCHEDULE 4.1A

### SCHEDULE OF EMPLOYEES SERVICES

Employee agrees to provide medical services on behalf of Employer according to the schedule as mutually agreed to by the parties from time to time.

4.1A-1

## SCHEDULE 5.2

## BENEFITS

1.  (6) corporate holidays, (10) vacation days, two-week notice must be given to Practice Administrator for days off.

2.  CME's to be paid at discretion of Employer.

3.  Bonus up to $4,000.00, annually earned in quarterly increments up to $1,000.00 per quarter. 40% is based on compliance, which would include Clinical, Medicare and Corporate. 20% is based upon Quality Assurance Committee, UR and Peer review participation.   20% adherence to administrative policies and 20% quarterly physician meeting attendance.

4.  Participation in Employer's health and other insurance benefits is available to the Employee on the first day of the month following 90 days of continuous employment.

5.  Other company benefits as determined by the then current company policy.

5.2-1

JS 44 (Rev. 12/96)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I.(a) PLAINTIFFS
MOBILE MEDICAL INDUSTRIES, INC.,
a corporation

MAGISTRATE JUDGE
JOHNSON

CIV-PAINE
04-81195

### DEFENDANTS
ELITE HOME HEALTH OF THE PALM
BEACHES, L.L.C., a limited liability company,
ELITE MD, INC., a corporation
JAMES PADULA, D.O., an individual

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  *Palm Beach*
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  *Palm Beach*
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
*Hank Jackson, Esq.   561-833-2000
Holland & Knight LLP
222 Lakeview Avenue, Suite 1000, WPB, FL 33401*

ATTORNEYS (IF KNOWN)

NIGHT BOX
FILED

DEC 29 2004

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   (PALM BEACH),   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE,   HIGH LANDS

CLARENCE MADDOX
CLERK USDC/SDFL

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [x] 3 Federal Question (U.S. GOVERNMENT NOT A PARTY)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

*91 04 CV 81195 - Paine Johnson*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in this State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. ORIGIN (PLACE AN X IN ONE BOX ONLY)

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgement

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury— Med Malpractice
- [ ] 365 Personal Injury— Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence Habeas Corpus:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Other

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt Relations
- [ ] 730 Labor/Mgmt Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [x] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademarks

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - Third party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

*Copyright infringement 17 USC 101*

LENGTH OF TRIAL
via *7* days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
- [ ] UNDER F.R.C.P. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND:  [ ] YES  [x] NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____   Docket Number _____

Date  *12/29/04*     SIGNATURE OF ATTORNEY OF RECORD  *Hank Jackson*

### For OFFICE USE ONLY
RECEIPT #  *532804*     AMOUNT  *150.00*     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____